## Thompson, &c. *vs* Drake's Heirs.

APPEAL FROM THE FAYETTE CIRCUIT.

*Fraudulent conveyances. Mortgages. Partnerships.*

CHANCERY.

*Case* 146.

*June* 6.

JUDGE MARSHALL delivered the opinion of the Court.

SEVERAL circumstances concur in support of the conclusion adopted by the Circuit Court, that the deed of the 7th of September, 1839, from David S. Drake to Charles R. Thompson, should be deemed fraudulent and void, as to the heirs of A. S. Drake, who were then prosecuting their suit in Chancery, for settlement and distribution, against said D. S. Drake, as his administrator, and within a few weeks afterwards, obtained a decree against him for nearly seven thousand dollars. Some of these circumstances will be enumerated:

*Circumstances warranting the conclusion that the deed from D. S. Drake to C. R. Thompson was fraudulent.*

1. David S. Drake seems to have been much exasperated against his brothers and sisters, complainants in said suit, for bringing the suit, and made threats indicating that any decree which might be obtained should not be satisfied.

2. Although Thompson, who had intermarried with one of said heirs, was, with his wife, a co-complainant in said suit, he seems to have taken sides with the defendant in his feelings and wishes, and now expresses the belief that the decree is for too much.

3. Thompson and D. S. Drake had been partners in the rope making business for several years, terminating shortly before said suit was brought, and there is ground for supposing that the great deficit in D. S. Drake's accounts, as administrator of his father's estate, resulted in part from advances made to the firm, of funds belonging to the estate.

4. Shortly after the commencement of said suit, Thompson voluntarily and without request, paid to said D. S. Drake, as administrator, and from the firm funds, $900, as rent due to the heirs of A. S. Drake, for their factory, which had been previously occupied by Thomp-

son & Drake for several years, and which, though most of it had been due for several years, had never been paid or offered to him until after the suit, calling him to an account, was commenced.

5. D. S. Drake had no estate nor means of satisfying the claims of his co-distributees except his interest in the partnership property and funds, and his interest in his father's real estate, amounting to about $2100, the partition of which was also sought and a sale of it effected in the said suit, and these facts may be assumed to have been known to Thompson.

6. The Commissioner to whom the accounts of D. S. Drake, as administrator, were committed for settlement, had commenced that business in April, 1839, and proceeding, at intervals, to hear the parties and their testimony, reported on the 17th of September following. Thompson attended during the progress of the business, and evinced his feelings in behalf of the administrator. On and before the 7th of September, when the deed in question was made, it was known that there would be a large balance in favor of the heirs, which Thompson regarded as excessive. In the latter part of August, a settlement of the accounts of Thompson and of D. S. Drake with the firm of Thompson & Drake, was caused by them to be made, partly from entries on their books and partly from separate memorandums or verbal statements, from which it appeared that Thompson was in advance to the firm $5403 02, and Drake $3277 50, making a difference of $2125 52 cents, which was due from the firm to Thompson; and at that time there were known debts of the firm, consisting principally of accommodation notes, coming due in the two Banks in Lexington, and renewable upon payment of calls and discounts, amounting, altogether, to about $2590; at the same time the assets of the firm consisted of a town lot, estimated by the tax assessor in 1839, at $1500, and in 1840 and 1841, at $1000; ten negroes, which together with one belonging exclusively to D. S. Drake, but included with the firm property, was estimated by the assessor in 1839, at $7050, and in 1840, at $5800, and a colored boy who had been bound to Thompson & Drake, and hired out by

them after they quit business; and second, of the hire of said negroes for the year 1839, coming due at the end of that year, and amounting to at least $1300; and third, of two debts due about the same time, both of which were deemed good, and were in fact realized within a short time after they came due. One of these debts was due in Mississippi and was equivalent to about $900 or $1000; the other, for between $2100 and $2200, was due in Alabama, making an aggregate of debts shortly coming due to the firm, amounting to $4300 or $4400, only $300 or $400 less than the amount of known debts coming due from the firm.

7. Between the time of the settlement above mentioned and the 7th of September, when the deed in question was made, Thompson & Drake negociated a final division of the partnership effects, and a settlement of its affairs, as between themselves, which, so far as the visible assets of the firm were concerned, was consummated by the deed. By that arrangement, of which the deed is to be taken as a part, the entire visible property, above mentioned, was conveyed by Drake to Thompson; the Mississippi debt was allotted to Drake; Thompson was to take the negro hire for the year 1839, and the Alabama debt was to be divided between them when collected, which was done by Thompson in March following. And as the consideration of the conveyance to Thompson, his claim upon the firm, (recited in the deed as being a debt from D. S. Drake to him,) was extinguished and he was to pay the enumerated debts of the firm, amounting to $2590, and also such other debts as might come against it, of which, however, it does not appear that any were then known, and of which only two or three hundred dollars have since appeared and been paid.

8. Setting down the liabilities of the firm at $5000, one half of which formed the consideration of the deed from D. S. Drake, it is evident that its assets, exclusive of the negro, Charles, the seperate property of Drake, were, taking the average estimates of the tax assessors, of value nearly or quite double the amount of its debts; and as its creditors, including Thompson, and Thompson himself as a partner, were entitled, in the appropriation

THOMPSON &c,
*vs*
DRAKE'S HEIRS.

of Drake's interest in these assets, to be preferred to the individual creditors of Drake, it is evident that he was in no danger from the anticipated embarrassments of Drake, and there is no ground to presume that he was impelled to make the arrangement above noticed, by a real anxiety for his own safety. Such a presumption is absolutely negatived by the fact stated by the witness who made the settlement between them, that he was willing, at that time, to have divided the negroes, and to have sold the lot for the purpose of producing equality, which would still have left in the Mississippi and Alabama debts, and the negro hire, an available and certain fund, more than sufficient to meet all the liabilities of the firm to strangers, and any balance which might probably remain due to himself. And it was the dissatisfaction of Drake that led to the arrangements subsequently adopted. By that arrangement, if valid, the whole of Drake's interest in the visible property of the firm, and even his separate property in his slave, Charles, and his interest in the hire for 1839, embracing all of his property and choses in action, which can be presumed to have been known or accessible to his creditors in Kentucky, except his interest in the proceeds of his father's real estate, were put out of the reach of his creditors, and his interest in the firm confined to the two foreign debts above named. And as there was no pretext for including in this arrangement, already furnishing more than an indemnity to Thompson, the interest of Drake in his father's real estate, and which being moreover involved in the same suit in which he was called on to make distribution of the personalty, the parties might well have supposed he could not withdraw from its appropriate liability in that suit. The arrangement may be characterized as *including* or intending to include all of his disposable property, visible and invisible, and putting so much of it as was accessible to his co-heirs, his separate creditors, entirely beyond their reach by vesting it in Thompson, upon the considerations which have been mentioned, and leaving in himself such interest only as was before inaccessible.

Why was this arrangement, so obviously injurious to Drake's separate creditors, entered into? Why was it de-

sired by Drake? Why was it acceded to by Thompson? As to Drake's motive, the circumstances which have been stated, and the very nature and obvious effect of the transaction, leave no room to doubt. He was desirous of defeating the recovery of his co-distributees, except Thompson and wife, and of putting in his own pocket such money as he could procure. The indebtedness of the firm to Thompson and to other creditors whom he might pay, afforded a plausible foundation for an arrangement by which this purpose could be effected. But why did Thompson cooperate? He was in no danger. He apprehended none. He was not urged on by a regard to his own safety as a partner: but being the friend of D. S. Drake in the suit, (though he was, in form, his adversary,) sympathising, as may be presumed, to some extent at least, in his exasperation at the proceeding, seeing that an unjust decree, as he conceived, was about to be rendered against him, his cooperation in the arrangement, of which the obvious and necessary effect was to defeat, in a great measure, the enforcement of the expected decree, may be fairly attributed to a concurrence in the illegal intent by which Drake himself was actuated. Or if any additional motive is to be found in the fact, that under the ostensible purpose of securing himself as a partner, he has obtained by the deed which defeats the recovery of his co-distributees, more than enough of D. S. Drake's property to indemnify him both as a partner and as a distributee ; such a motive, implying bad faith towards his co-complainants and co-distributees, would, if it existed, be very far from giving any sanction to the unjust advantage which the deed, if effectual, would secure.

This inference of Thompson's concurrence in the fraudulent intent of Drake, to defeat the enforcement of the decree expected to be rendered against him, derives additional strength from the particular facts relating to the consideration of the deed. And first, it may be stated, that looking to the time and manner of the settlement and the circumstances under which it was made, its accuracy cannot be regarded as entirely free from suspicion. But waiving this uncertainty, the deed, in setting forth the considerations on which it is founded, states as the sepa-

Circumstances indicating the concurrence of Thompson in the fraudulent intent of Drake.

THOMPSON &c.
*vs*
DRAKE'S HEIRS.

rate debt of Drake the entire debt of the firm to Thompson, and thus adds nearly $1100 to the real consideration. It is alledged by Thompson, in a third answer filed in this suit, brought to set aside the deed, that this was a mistake which he is willing to correct; and it is contended that the deed should be considered as if the parties actually believed the debt existed as therein stated. But there can be no absolute certainty that there was such a mistake in fact, and even if it were so, this would tend to prove that the parties were less anxious about the true state of the accounts between them than they were about securing the effect of the deed, by stating as large a consideration as the case would admit of.

The fact that the mortgage recites a consideration from mortgagor to mortgagee, at a greater amount than that which is really due, shows a concurrence of mortgagee in the fraudulent intent of mortgagor.

But conceding that the parties were under an actual mistake on this subject, and that both believed that Drake was indebted to Thompson in the whole amount of $2125 52, due to him from the firm, which, added to $1295, one half of the liabilities of the firm, as stated in the deed, would make the supposed consideration to Drake amount to $3420 52. But according to the estimate for the tax of 1839, the value of Drake's property, conveyed by the deed, was at least $4575, and according to the estimate for 1840, it was at least $3700, besides his interest in the boy, Isaiah, hired for more than $100 a year, and which was included in the deed; in addition to which, Thompson became entitled to the whole negro hire for the year 1839, of which, as the rateable proportion from the date of the deed, say $400, may be regarded as intended to pass for the consideration mentioned in the deed, or as passing without consideration, since the Mississippi debt fell short of the amount of the hire of that year by about the same sum of $400.

If the estimate of 1839 be taken, here is an excess in the value of the property which passed to Thompson by the arrangement, beyond the consideration which Drake received, or rather was supposed to have received, of about $1600; and if the estimate of 1840 be taken, when the property was taxed as belonging exclusively to Thompson, and the estimate may have been made even after this suit was brought to set aside the deed for fraud, there will still be an excess of about $800; and it will be but

little diminished if the estimate be taken from the answer of Thompson in this suit, when he was under strong inducement to support the deed and to vindicate himself. Calculated upon either basis, the excess gives a greater profit to Thompson than as a creditor, honestly seeking to secure himself by taking a conveyance of the property of his embarrassed debtor, he had a right to take from other creditors, and especially when he was knowingly depriving them, to the same extent, of the means of satisfaction. It may be remarked too, 'that in the settlement which entered into the consideration of the deed, one item, consisting of the hire of Drake's negro man, Charles, was, by consent of the parties, upon grounds not explained, charged against the firm for one year only, when it would seem that it might have been so charged for several additional years.

It has been already seen that Thompson was not impelled to make this arrangement by a sense of its being necessary for his own security. Did he enter into it for the purpose of making this great profit to himself, at the expense of his brother-in-law. D. S. Drake? Or was it to defeat the claim of his relatives, the complainants, which he believed to be unjust? Looking to the relationship and sympathy between Thompson and Drake ; the looseness of the settlement between them ; the inaccuracy of the statement of the consideration; the pendency of the suit against Drake, then on the eve of terminating in a heavy decree, and the absence of any necessity for Thompson's taking Drake's property absolutely to himself, for the purpose of securing his own safety; the great excess in the value of the property taken, above the consideration ostensibly received by Drake, besides being itself unjust towards other creditors of Drake, and demonstrative of the intent to hinder and delay them, must also be regarded as affording a strong presumption of a secret trust in favor of the debtor, whereby he should receive, secretly and for his own use, some further consideration not appearing in the transaction.

But again, Thompson knew that D. S. Drake had no means for satisfying the claim of his co-heirs, except his interest in the firm, and in his father's real estate, and

When one, tho'
a creditor to
some extent,
takes a mortgage

THOMPSON &c.
vs
DRAKE'S HEIRS.

reciting a consideration much beyond what is actually due, and covering an excess of property beyond what would be necessary to satisfy the sum really due, and leaving nothing, out of which to satisfy a decree then expected by both mortgagor and mortgagee shortly to pass vs mortgagor, fraudulent in both.

when the arrangement in question was made, he knew that this latter interest was utterly insufficient to satisfy the decree that would be rendered against him—why then did he, without necessity, cooperate in the withdrawal of Drake's interest in the firm from the reach of the decree, and in converting it into that which he might put into his own pocket? Why did he, shortly after that claim was asserted by suit, put $900 in money, due from the firm to the complainants, into the hands of D. S. Drake? And why, after the decree was rendered, and he knew D. S. Drake's utter inability to satisfy it, and knew too, that by the arrangement between them, every means of coercive satisfaction, except the interest in the real estate of A. S. Drake had been withdrawn, did he pay over to Drake one half of the Alabama debt? The answer to all these questions must be the same as that which is indicated by the other circumstances in the case, and that is, that he concurred in the intent of D. S. Drake to hinder and defeat the recovery of his co-distributees; that he cooperated with him in the means of attaining that object, and that the deed in question was resorted to as a part of those means, and was made and received for the same illegal purposes. He was therefore entitled to take no advantage from his deed, and was properly remitted by the Court to his lien as a partner, by which he is secured in all his real advances for the firm, and to the reimbursement of which the firm property was intended by the decree to have been subjected.

So much of the decree, therefore, as declares the said deed of the 7th of September, 1839, fraudulent and void as against the complainants, and directs a sale of the property therein mentioned, is affirmed; as is also that part of the decree which appropriates the share of D. S. Drake in the proceeds of the real estate of his father to the satisfaction of the claim of the complainants, subject to the option of Thompson and wife to take the benefit of that appropriation to the extent of their interest as co-distributees. Various errors have, however, been assigned by both parties in the details of the decree, which are based upon the Commissioner's report, and some of these it is necessary to notice. The report consists, first,

of a statement of the account between Thompson and
the firm of Thompson & Drake, in which he is credited by all payments made for the firm, including a portion of the rent of the factory, paid to D. S. Drake, and charged with the hire of the negroes of the firm, including that of Isaiah and Charles—and secondly, of a statement of the rent due to the complainants, for the factory while it was occupied by Thompson & Drake.

With regard to the charges against Thompson, in his account with the firm, we think there is no error to his prejudice. Having received hire for Isaiah, he was, of course, chargeable with it; and having received the hire of Charles, the separate property of Drake, as that hire was brought into his account with the firm, it was necessary to the ascertainment of the true balance that he should be charged double the amount received by him, otherwise Drake's interest in the firm property would have been burthened with one half of the hire of his own slave, received wholly by his partner, Thompson. We are of opinion, however, upon the cross error assigned by the complainants, that Thompson was improperly allowed a credit for $100, with its interest, being the sum borrowed by him to bear the expenses of going to Alabama, for collecting the above mentioned debt due to the firm in that State. The expense of collection would seem properly to have been chargeable upon the amount collected, and the presumption is that it was paid out of the gross amount before division. There is no evidence that Thompson paid it out of his half; and as it does not appear to have been any part of the arrangement of Sept. 1839, when the funds of the firm were divided, that Thompson should go to Alabama to collect this debt, the expenses of the trip cannot be regarded as one of the debts which, by that arrangement, he was to pay.

*The expenses of one partner in collecting a debt due the firm is properly taken out of the amount collected, and not the subject of a distinct charge against the other partner.*

On the other hand, there seems to be an error against Thompson, in the report and decree, in not crediting him, in his account with the firm, with as much as he should have been credited with on account of the payment of $900 to D. S. Drake for the rent of the factory. The complainants reject this, as they have a right to do, as a payment of the rent due to them from the firm: but as

Thompson & Drake were each entitled to one eighth part of the rent due to the heirs, the payment by the firm to D. S. Drake was good to that extent, and so far extinguished the debt of the firm : but beyond this it was, as between the partners, nothing more than a withdrawal of so much of the firm funds by Drake, which entitled Thompson to withdraw an equal sum before a division should take place. In making up the account of Thompson with the firm, he should therefore be credited by this sum, to be ascertained by deducting from the $900 paid, a sum equal to two-eighths of the entire rent due from the firm to the heirs of A. S. Drake, for the factory. The balance, with its interest from the time the $900 were paid, should be credited to Thompson, and the entire residue, that is, six-eighths of the rent due to the heirs, without interest, should be stated and decreed as a debt from the firm to the complainants, to be made out of the firm property before a division.

The Commissioner does not appear to have made up his account and report on the subject of the rents, in accordance with these principles, nor does the record furnish precise data on which to estimate the total rent due from the firm to the heirs, and it may be, that upon a proper statement of the account, the result will not be more favorable to Thompson than that which appears in the report and is adopted in the decree. But as the report seems to have been based on the assumption that $900 was the total amount of rent due to the heirs, and as upon that assmption, which, as the report seems not to have been objected to in the Circuit Court, should in the present attitude of the case, be taken as correct, the balance appearing in favor of Thompson is smaller, and the amount of rent appearing due to the complainants, larger than it would be upon a correction of the account in the manner above indicated, the error in the report and decree must be deemed prejudicial to Thompson. Wherefore, so much of the decree as fixes the amounts due from the firm of Drake & Thompson to Thompson, and the amount due from said firm to the complainants for rent, and so much of it as directs the appropriation, upon that basis, of the proceeds of the sale of the property

decreed to be sold, is erroneous, and must be reversed, upon the writ of error of Thompson, &c, and the cause, as to that matter, is remanded, with directions to recommit the accounts to the Commissioner, to be made out upon the principles above indicated, and with authority to ascertain the facts necessary for so doing, and also to receive evidence of any further charges or credits, for or against either, and to include in his statement of the account, such as may be established, and as, according to the,principles of this opinion, should enter into it, and to bring up the charge for negro hire: but the residue of the decree is affirmed; and there being but a partial reversal, each party must pay his own cost in this Court.

Decree reversed, &c.

*Pindell* for appellants: *Robinson & Johnson* for appellees.